322-0232 calls Cassidue as Independent Administrator of the State of Lois Cassidue Deceased amply by Lynn Dow v. Daniel Jurak D.O. and Daniel Jurak D.O. S.C. appellant by Melinda Kroll-Ross May it please the court. Counsel, Melinda Kroll-Ross on behalf of the defendant, Dr. Jurak, this is a medical malpractice case where the trial court ruled as a matter of law, contrary to all existing Illinois precedent to date, that a spouse's lost household services are not part of a loss of consortium claim. Indeed, the plaintiff even admitted below that they do not dispute the defendant's assertion that household services are, in fact, a part of loss of consortium. We have over a half-century of Illinois law, both Supreme Court and appellate precedent, that establishes the error in the ruling below. From Dinnie, Manders, Wagg, Dotson 1, Dotson 2, Pfeiffer, these cases clearly and unambiguously hold that lost household services are part of loss of consortium. This predicate error that the trial court made, which is one of law, produced two erroneous rulings that prejudiced the defendant and require a reversal in part or a remititure. First, the trial court allowed an expert, Stan Smith, to offer monetizing testimony on the marketplace value of a spouse's lost household services. And secondly, Mr. Smith was allowed to testify about lost household services extending four decades past the date of the plaintiff's remarriage, contrary to the Carter remarriage rule that says loss of consortium damages end upon remarriage. The trial court respectfully misread Pfeiffer. It held, based on Pfeiffer, I'm going to make a ruling that they are not part of loss of consortium, that they are just pecuniary damages, and so Smith will be allowed to testify beyond the remarriage date on that household services portion. The court itself, again respectfully, recognized that it might be wrong. At page 628 of the record, the reports of proceedings, the court explains that in reading the cases, a reviewing court might say that they're all over the map and maybe this is the right case to get it straightened out. The court says, I hope not for some reasons, but if I can make some law on that, then so be it. And we ask, the defense asks, that you address these issues and make that determination here, that you confirm, consistent with the existing precedent of over a half century, that lost household services are a part of consortium damages, that they are not subject to expert testimony calculating a marketplace value, and that they do not extend beyond the date of a spouse's, in this case, the plaintiff's husband's remarriage. And I want to cite the case of Pfeiffer and the Dodson 2 decision as support for our position. From Dodson 2, the appellate court states, after Elliott, remarriage limits a claim for material services as much as it limits any other element of consortium. To my view, and I believe the view of this court, that's a pretty definitive statement that there was error here, and the error was enormously prejudicial. And I will get to that in a moment, but suffice it to say, as we've laid out in our briefs, Stan Smith was allowed to testify to nearly a million dollars worth of lost household services, marketplace value, extending four decades past the date of the plaintiff's remarriage. The defense counsel put on an offer of proof that if Smith's testimony, and I don't think he should have been allowed to testify at all, but even assuming he was, for the 15 months between the date of the decedent's death and plaintiff's remarriage, he calculated the value of those services at $24,000. So we have a $970,000 swing with this erroneously admitted evidence. And I did cite to the court, and I will just reiterate here, this is a question of law. This isn't the normal evidentiary abuse of discretion. We've got a brand new Q. West decision that we moved the court to allow us to be able to discuss here that says where the evidentiary ruling is based on a legal determination, a matter of law, it's reviewed de novo. Is it your position that Pfeiffer agrees with Dotson too? It is my position with respect to this issue of lost household services. And I want to read the key portion to you that says exactly that. It says, loss of consortium reflects the loss of personal benefits and satisfactions the surviving spouse enjoyed as a result of a highly individualized relationship with a particular person. The relationship and those benefits cannot be duplicated. As for material services, that's what household services are, we note, citing other decisions, that the courts speak of a wife's services in the home, services as the spouse's wife, and personal services. The court's discussions do not include, even by implication, the concept of financial support. And that's what the court here put together. They said material services, household services, are like financial support. The court continued in Pfeiffer. Two, while some material services are clearly more tangible in nature than such things as affection and companionship, they are also highly personal to and generally flow from the particular relationship between specific spouses. As such, they are properly part of consortium. And then the very next paragraph starts, in contrast, financial support lost due to the wrongful death of a spouse is totally tangible. So Pfeiffer draws the very distinction that the defendant argued for below and that we ask you to draw on appeal. We've got more tangible material services, household services are more tangible than love and affection, but they're not totally tangible as in financial support. And so here... Give me an example of a household service that's not tangible. A household service is more tangible. Give me an example of any household service that's not, that's amorphous along the lines of traditional consortium. It's tangible, but the reason for doing it is not. If I take care of my spouse while he's sick and I bring him bandages and put a rag on his head, arguably those are nursing services and I could get a home health care worker to do that. So it's always capable of being calculated, if you will. I mean, the reason for doing it might be different, but you can place a value on it. Not in the context of consortium, because maybe I don't care about my spouse at all and he can lie there sick and I'm not bringing him anything. That's really the point in Pfeiffer here of talking about, it's personal, it's unique between these spouses. Because there's a quote that I think gets to what you're talking about, where they're drawing the distinction with financial support and then they say, that can flourish in a marriage, even though many elements of consortium may be at low ebb or even missing altogether. So if I'm earning money as an attorney, it doesn't matter whether I care about my husband or not, an economist can come in and say, Attorney Kohlroth makes this much money, there's the loss. That expert cannot come in and say, Attorney Kohlroth for providing these bandages and this care, that's home health care of $15 an hour and that's what it should be. And that really is what this case is all about, when they talk about the personal relationship. So was the decedent planting flowers with her husband because she's a landscaper, a gardener? Or was it something that they shared and that they enjoyed as part of their spousal relationship? And the cases we've discussed, Illinois precedent at Pfeiffer and Patch says, the jury is in the position to decide what the value is on those services in this context. The jury is going to hear whatever evidence is presented about the nature of their marriage, how these spouses dealt with one another, and they are going to put a value based on their experience and their collective wisdom. And it's not going to necessarily be a $14.99 an hour valuation. It isn't marketplace because she's not. Smith says, I calculated based on a stranger to the household what they would charge to do this. But the decedent wasn't a stranger. She's this unique spouse in a particular relationship that all of these cases talk about. So Smith or any other expert, again, this is a legal issue for you to decide. We don't bring in experts to say, I'm looking at labor statistics and this is the value on those services. Assuming for the sake of analysis, you're correct in terms of what you're arguing. In terms of remedy in this idea of remitter, I know what Smith testified to, but how do we know the jury didn't assume that the wife was going to work past the age of 67, which she could have? Maybe she would get promotions. She was reputed to be a very good worker and then respected by her colleagues. How do we know that the jury didn't, in coming up with the figure that it arrived at, ascribe more money to that part of it? How do we assume that they took Smith's numbers and went with those? I think we've definitely got error here in the admission of the evidence from Smith, and it's a big error. I don't want to assume that part of your analysis. I just want to know, if you're talking about remitter and you're looking at the monies that Smith gave, how are we to presume that the jury didn't give more credence to the idea that she might get promoted, that she might work past 67? The evidence just isn't there to support it. Even if you gave a little bit more time, she would have had to live past her life expectancy. She would have had to get raises that were completely out of bounds with what Smith testified to. I mean, this is what the plaintiff asked for. This is what Smith testified to. And there was no other evidence. So he asked for $913,000. You would have to find that this record is sufficient for the jury to award an additional $500,000 on top of that to say that no money was awarded for lost household services. And I don't think you can find that on this record. There might be a situation where you really couldn't tell, but this case isn't it. And when you have this type of prejudice where the dollar amounts are so large, I think it's very reasonable to look at the total amount awarded and say, it couldn't have been, based on this record, this amount of $1.434 million based solely on lost wages. And so this whole issue about waiver, I think, falls to the wayside. The defense does not have to craft jury instructions and prepare a verdict form to try and back out improperly admitted evidence. And I think at minimum here, we have a sufficient showing of prejudice. If you don't feel that you can parse out a dollar amount, we've suggested some with remittances, giving them the benefit of the doubt, which is that every penny of the $913,000 that Smith testified to and the plaintiff asked for, if we give them all of that, you've still got a remittance of almost $500,000. And if you can't discern from the record how this played out, then we ask for a new trial just on that damages element. And then we can present evidence. They can present their evidence. And the jury can decide lost wages. They can decide lost household services. So there are two options that are within this court's power to do. And either of those, I think, are required here because the prejudice is manifest. And the error, I believe, is manifest. And so some relief should be afforded. Again, when we have laid out the evidence in the record to say that this was all lost wages is not supported by the testimony, and it's not what they asked for. So in that respect, we would ask that you award relief and that you rule that this was an error, that Smith's testimony should not have come in in any respect, not just as post-dating the remarriage, but is not admissible to go to loss of consortium at all. So if this matter does go back for a limited new trial on damages, the court knows the evidence that is permissible and the evidence that is not. And with that, if there are no further questions, I'll save the rest of my time and just address in rebuttal. Any further questions? No. No. Thank you. Thank you. Thank you. Ms. Dowd, you may respond. Good afternoon, Your Honors. May it please the Court. With the Court's indulgence, I'd like to address three areas to make some important corrections to the record, the law, and the facts. I'd like to highlight how, first of all, there's no error for this Court to correct today. The verdict is fully supported by the evidence and that the law allowed the trial court to rule as it did. But briefly, I just want to comment on the appropriate standard of review. As the Court is well familiar, all presumptions are in favor of a verdict, and our Supreme Court has held that the admission of evidence, the decision to allow an expert to testify or not to testify, is the abuse of discretion standard. Defendants are trying to get this Court to not adhere to the proper standard of review because if you do, their appeal fails. They're trying to cast this as a question of law, and it's just not. The couple cases they cite deal with issues like 213. They deal with questions of law, not the admissibility of evidence. And one statement in their reply brief, they contend that the trial judge based his ruling on whether or not Dr. Smith could testify based on the law. Well, every judicial ruling in a trial is based on the law. So if that's the state of the law, that is the only standard of review de novo, and that's not what we have here. Again, our Supreme Court said we're looking at an abuse of discretion standard, and they're seeking relief from the denial of their post-trial motion. That takes us into the Pedrick standard, where all presumptions and inferences are in favor of a non-moving party here at the plaintiff. Now, having said that, at issue is the appellants. We have an appellate practice, trial court practice 101 issue. They must demonstrate that there is prejudicial error for this court's review, not just a big error, as counsel asserted, not just an error, but prejudicial error. And it's their burden to prove that to this court, and they're contending that the error is the jury's verdict of 1.4 plus or minus, $1.4 million for the loss of household services, loss earnings award. They're really challenging that line item in the entire verdict. Well, it's their burden to show why it was that erroneous. They cannot do that for several reasons. Number one, the verdict itself. This is the verdict form they wanted to go to the jury. It has a combined line item for lost earnings and lost household services. The defendants could have tendered a proposed alternative instruction seeking to break out those two awards. What's the likelihood of the judge going along with that type of a request in light of the motion to eliminate ruling and the other rulings? The judge would have just said no. I mean, they preserved it, right? They made the motion to eliminate. They made a post-trial motion. They don't need to sit there and say, we want a jury instruction judge that's counter to what you've already ruled. They don't have to do that. Respectfully, Your Honor, I disagree. I think the black letter law is clear. They must preserve the error at each and every stage of the proceedings. And incidentally, in rereading the record in preparation for this argument today, at pages 1235 and 36 is the defendant's motion for a directed verdict. At the close of the plaintiff's case in chief, they raised none of these issues. That's a forfeiture. I'm not just talking about forfeiture, even though that's in this record. I'm talking about preservation of error. And the black letter law says they must, in this case, the motion's eliminated. Normally, you'd have to object, but the trial court allowed them to preserve the motions and eliminates an ongoing objection. That's okay. Next step, at the close of plaintiff's case in chief, they didn't raise any of these objections. The next required step is at the close of all the evidence, and that's their post-trial motion, and we'll talk about that. But what I'm talking about is not just objecting. They have to show that they gave the trial court every opportunity to correct this error. And to your point, Justice Brennan, we don't know that the trial judge wouldn't have allowed the breakdown because that's a distinct issue. That's whether or not there's going to be a ward for lost earnings and loss of household services. Their objection in the motion to eliminate was nothing for household services. And based on the evidence presented and the arguments of counsel, the jury, if they were given that opportunity with the two line items, could have put zero in there. But that was their burden to show. This court does not have to assume anything. It is their burden to show that the jury, in fact, made any award for household services, and they can't do that. There were other opportunities in the instructions defining loss of consortium. If this household services issue was so important, they could have tendered a proposed instruction, and there are modified non-IPI instructions in this record, asking to instruct the jury that loss of consortium includes household services. They didn't do that. There's a later instruction that did go to the jury that loss of consortium damages end at the date of remarriage. So the jury could have had all these instructions, and then they could have determined whether they were giving any award. But we don't know that. But there's a flip side to that coin, because the record allows this court to conclude that there's sufficient evidence to conclude that the jury awarded all of that money for lost earnings. And I'm going to get into that. Another opportunity where they could have demonstrated to this court their claim that the jury awarded anything for household services would have been the tool of special interrogatories. The Code of Civil Procedure gives losing parties a lot of tools to raise, preserve, and then demonstrate to the reviewing court there was error. They availed themselves of none of those. They could have asked two questions in a special interrogatory. One, are you awarding any damages for household services? That would have been yes or no. If the jury said yes, that would bolster their claim of error. But if the jury said no, we wouldn't be here. It's their burden to show that the jury did, and they didn't do that. They could have asked, are you awarding anything for household services after the date of remarriage? They didn't ask that. Two simple special interrogatories to test the jury's award so that this court could ascertain whether there's any error in this $1.4 million damage award. It's not for us to come in here, even though I'm about to demonstrate how it was appropriate. It's their burden to show error, prejudicial error, not just any error. There are other opportunities I'd like to also mention, just incidentally. It's really important to underscore the defendants brought in no expert of their own, no economic expert to controvert Dr. Smith. His testimony is unrebutted. They brought in no expert to testify that here's what household services are, here's where they terminate, we don't think you should award anything, or here's the number. There's nothing. Dr. Smith's testimony stands uncontroverted. They were given the opportunity to cross-examine Dr. Smith. They did. Counsel was given the opportunity for closing argument. Okay, so having said that, and I will get into the law momentarily, the $1.4 million verdict is fully supported by the evidence for this court to determine that the entire award was for lost earnings. Here's why. Well, actually, a couple of things. The lost earnings, but also the verdict actually is supported by evidence that all or part of it could go to household services. The evidence could go either direction, and that's the problem with them not breaking out the two. But in any event, with respect to Dr. Smith's testimony, let me just highlight his uncontroverted testimony. He said, okay, first of all, the law says the jury doesn't have to accept any of his testimony. It was in their province to accept it, to reject it, to give more, to give less. They are the ultimate arbiters of what, if any, amount goes to these damaged awards. And in their wisdom, they determined $1.4 million was the number. The allocation, again, we don't know as we stand here because we don't have that breakdown. In any event, Dr. Smith testified his estimates were conservative. The decedent was 34 years old on the date of death. He estimated that she lived to be 78.3. He estimated she'd work to 67. But he testified she could work another 13 years because there's a variable with every person. Everybody's different. He also based his opinion on the National Vital Statistics, which, by that evidence that went to the jury, it said she could have 48.2 more years of work, as opposed to an additional 33. So the jury was for them to decide, based on the evidence they heard, are we going to add 33 more years or are we going to go up to 48? That's a wide variance on them to calculate the numbers for the awards. And it's actually a 50% variability, like from 33 or 34 more years of work to 78. That's a 50% increase. There you have the number right there. If his testimony was only about $900,000 for lost earnings and they went 1-4, they added the 50% right there. But also, he testified her hourly wage for her services was $14.99 an hour. We know that in 2025, the minimum wage by law is going to $15 an hour. The jury, in its wisdom, was free to adjust that figure. That's a large variance in their numerical calculations. His valuations, he said, had a plus or minus variation of $28,500 a year. That gives the jury an evidentiary basis for working the numbers. Raises were not accounted for. But here is something that really demonstrates how smart juries are. As I think everyone in this courtroom can attest, the past is not prologue. His estimates were based on an inflation rate for the next 34 years of 2-3%. Just by way of illustration, we know that in 2022, we're at 8.8% inflation. And those numbers are not exact. I say that for illustrative purposes. This year, we're at 6.6%. Many of us have lived through higher interest periods than 2-3%. And those on the jury did likewise. And in their wisdom, they didn't have to accept that very conservative estimate on Dr. Smith's calculations of just 2-3% a year. His testimony had a proper foundation under Wilson v. Clark. He delineated all the bases for his opinions. He's a preeminent economist. He based his opinions on facts. He interviewed Paul Possefumi extensively. He did an interview. He studied labor statistics and other data. His opinion, again, had a proper foundation, was uncontroverted. Now, in addition to Dr. Smith, Paul Possefumi testified. He testified about his wife, his deceased wife, and the services she provided. The jury was free to evaluate his testimony. And the law says an award is reasonable even if the evidence presented in support of that is meager. But notwithstanding all that, I'd like to address the law dealing with household services awards. And a very careful reading is warranted because the law does not, this court will interpret those cases, but I have to correct what the defense counsel said today. First of all, if we just focus on a few of the cases, Pfeiffer, 1993, that's really a very, very sophisticated analysis of these damages because they break the damages down into three areas. There's consortium that historically, you know, goes to the intangibles of the marital relationship, the conjugal relationship. No economist can put a number on that, and that terminates on the date of remarriage. It's personal between that man and that woman. Then they talk about material services. These are not the same as financial services, and Justice Brennan, I think you were starting to ask about that. These are home services that are unique to a marital relationship. So that type of material services would terminate on the date of remarriage. But in this context, there's also financial support services. Those are tangible. The other two are intangible. This one's tangible, and this is where the trial court's analysis comes in. Tangible services are subject to an economic analysis. And remember, the economist, the expert, was provided only to aid the jury in its determination of an appropriate damage award. The Fifer Court explains that these types of services are not highly personal to the special relationship between the husband and wife, and those are exactly the ones at issue here. Household chores, gardening, bookkeeping, these type of objective services that help the family unit. It's not something uniquely personal to a man and a woman. Therefore, those types of services do not terminate on the date of the marriage. And actually, the court held that the trial court erred in barring evidence, that evidence being an expert, an expert economist, to testify beyond the date of remarriage as to these types, the pecuniary value of these tangible services. But the other cases, we've cited Williams, a 2015 decision, which also does a pretty straightforward analysis. Now, yes, that was an FELA decision, which is a Federal Statutory Negligence Action, but it, right in paragraph 49, rejected that household services are the equivalent of loss of consortium. And the court there stated, household services as compensable damages are allowed due to them having nothing to do with the marital relationship. They're discernible, they're quantifiable, they're tangible. The jury can hear evidence. All right, Your Honors, my time is up. Unless you have any questions, I thank you very much. No, thank you. Thank you, counsel. Thank you. You may reply. Thank you, Your Honors. As far as the standard of review, which is, of course, critical for this court, the Q.S. decision, which is only about a month and a half old, states normally a trial court's decision to admit or exclude evidence is a matter within the court's discretion and will not be overturned on appeal absent an abuse of that discretion. We all know that standard. However, where such a decision is based entirely on an interpretation of law, that's where the decision to admit or exclude, based entirely on an interpretation of law, our review entails a question of law which we review de novo. And the trial court specifically said it was admitting Stan Smith's testimony, both the entirety of the economic analysis about marketplace value and then, again, specifically extending past remarriage based on its determination that household services were not a part of consortium. So it is that legal issue that was the foundation for its decision whether to admit or exclude the evidence. That presents a question of law subject to de novo review. As far as these issues regarding the Williams case, does not support the ruling here because Williams did not involve loss of consortium. In fact, the court points out we're not talking about consortium here. It was the injured plaintiff seeking recovery for household chores that he could no longer do for himself. So there was no spousal relationship. There was no quality of the marriage. The court points out it's got nothing to do, the loss of household services has nothing to do with Williams' relationship with his wife. So completely different by its own discussion, completely different from the cases that I talked about with Dodson and with Pfeiffer. And Pfeiffer, it's interesting and noteworthy to point out that the defense brought a motion in limine to exclude loss of consortium damages past remarriage. The plaintiff acquiesced. The only thing that was at issue was loss of support. Can loss of support continue beyond remarriage? And the court said while under, it says when plaintiff conceded defendant's motion in limine regarding loss of consortium, she did not concede her claim for loss of support. While under Carter, loss of consortium damages terminate upon remarriage, all of them, and they've just said material services, household services are part of them. Watson teaches that remarriage is irrelevant to damages for loss of support. So Pfeiffer is drawing the very line, the very distinction that we are arguing for here. Ms. Koros, can I interrupt you? You sure can. Can you just discuss this forfeiture argument, failure to ask for the jury instruction that would separate out the damages consistent with the theory that was advanced by the appellant and the failure to make a motion for a directed verdict as it relates to these claims? Well, the directed verdict motion would have been improper because the plaintiff was entitled to some lost household services. The plaintiff testified, even if Smith, all that testimony shouldn't have come in, the plaintiff himself testified, she cooked, she cleaned, she did some laundry, so they're entitled to some recovery there, and we've never said they're entitled to zero recovery. So there would have been absolutely no basis for a directed verdict on that element. So that falls by the wayside. It was the court that said, I consider household services and lost earnings to be the same. That's why they were put on the same line. It wasn't our desire to have them lumped together. It was the court's determination as a matter of law that they were equivalent. That's what brought Smith's testimony in in the first place. Otherwise, all of that would have been out. And I submit you're all very experienced jurists. If the record here really supported $1.434 million in damages for lost earnings, wouldn't the plaintiff have asked for that? The plaintiff asked for $913,000. That's what the evidence showed. There was no support in the record for an additional $500,000. And so if you look at this case and say, well, unless you can parse out the exact amount of the damage, you don't have prejudicial error, how would that impact a myriad of cases where there's prejudicial error? We know Smith shouldn't have been allowed to testify, and the swing in the dollar amount was $970,000. I submit that is prejudicial. Thank you, Your Honors. Any questions? No. No, thank you. Thank you. Thank you, counsel, both, for your arguments in this matter this afternoon. It will be taken under advisement. The written disposition shall issue. The court will stand and brief recess.